## DURYEA *v.* RICE.

---

PATENTS; INTERFERENCE; APPEALS; OPERATIVENESS; DIVISIONAL APPLICATIONS; CONSTRUCTIVE REDUCTION TO PRACTICE; ABANDONMENT.

1. On an appeal from a decision of the Commissioner of Patents in an interference case, the question of the operativeness of the device cannot be considered by this court as an incident of the main question of priority. (Citing and distinguishing *Dodge* v. *Fowler,* 11 App. D. C. 592, and 14 App. D. C. 477.)

2. A divisional application filed while the original application is depending in the Patent Office will be held to be a continuation of the latter, and therefore to relate back to its filing date, thus giving the applicant the benefit of his original application as a constructive reduction to practice, in a subsequently declared interference. (Citing *Cain* v. *Park,* 14 App. D. C. 42.)

3. Where two years have not elapsed after final action by the Patent Office on an original application, before the filing of a divisional application. U. S. Rev. Stat. sec. 4894, U. S. Comp. Stat. 1901, p. 3384, providing that application shall be regarded as abandoned upon failure of the applicant to prosecute the same within two years after any action thereon, does not apply.

No. 364.   Patent Appeals.   Submitted November 19, 1906.   Decided December 4, 1906.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an interference proceeding between rival applicants for the invention of an improved gas engine, the issue in which has been defined in twenty-two counts, as follows:

"1. A plurality of compressing chambers and separate explosion chambers, free connected piston heads in the explosion chambers, and means for supplying explosive charges from the compressing to the explosion chambers, and firing the same to propel said piston heads reciprocally in both directions.

"2. A plurality of compressing and explosion chambers, free piston heads therein, positively connected for mutual reciprocation, means for supplying explosive charges to the compressing chamber, transferring the charge to the explosion chamber, and firing the same therein to propel the piston heads reciprocally in both directions.

"3. A plurality of explosion chambers each having inlet and exhaust ports, free piston heads in said chambers positively connected for mutual reciprocation to open and close said ports, and to supply explosive charges to said chambers through said inlet ports, means for firing said charges, and a free power transmitting element actuated by the piston heads.

"4. Separate charge compressing and explosion chambers in pairs, free piston heads, one for each pair, means positively connecting the piston heads for mutual reciprocation, a free power transmitting element connected with the piston head, and means for causing the compression and explosion of a charge by and against each piston head at each complete reciprocation.

"5. The combination with separate charge compressing and explosion chambers arranged in pairs, of free piston heads, one for each pair, means positively connecting said piston heads, and

means for causing the compression and explosion of a charge by and against each piston head at each complete reciprocation.

"6. In an explosion engine, a body provided with separate charge compressing and explosion chambers, a free piston between said chambers, and a free power transmitting element connected with the piston.

"7. A body having separate charge compressing and explosion chambers in pairs, supply ports, each connecting a compression chamber with an explosion chamber, an inlet for each compression chamber and an exhaust port for each explosion chamber; free piston heads for said pairs respectively, positively connected for mutual reciprocation, each closing the supply and exhaust ports of its explosion chamber during compression and explosion; means for causing explosions for propelling the piston heads respectively, and a free power transmitting element connected with the piston head.

"8. A body provided with a plurality of separate charge compressing chambers and explosive chamber respectively, free piston heads therein, positively connected for mutual reciprocations, and free power transmitting element connected with the piston heads.

"9. A body provided with a plurality of aligned separate charge compressing chambers and explosion chambers respectively, axially aligned free piston heads in said chambers, positively connected for mutual reciprocation, and a free power transmitting element connected with the piston heads and arranged in axial alignment with the chambers.

"10. A body provided with a plurality of aligned separate charge compressing chambers and explosion chambers respectively and a bearing; free piston heads in the chambers, an axially movable element in the bearing, and means for positively connecting the element with the piston heads.

"11. Separate charge compressing and explosion chambers, piston heads therefor, positively connected for mutual reciprocation and having variable termination of stroke at both ends; means for supplying explosive charges to said explosion cham-

bers through said compression chambers, and means for firing
the charges in each explosion chamber when the piston head
therefor is within the zone of its stroke termination.

"12. A plurality of axially aligned close-ended separate
charge compressing and explosion chambers in pairs, a free
piston head for each pair, a connector positively connected with
said piston heads, and a free power transmitting element con-
nected with the connector.

"13. Explosion chambers, means for supplying unignited
explosive charges of gas or vapor to and firing the same in
said chambers, free piston heads in said chambers rigidly con-
nected for mutual reciprocation, a free power transmitting ele-
ment connected with said piston heads, and a guide for said
element.

"14. A casing, a cylinder, a piston therein, a second cylinder,
a piston therein, a piston rod connecting said pistons, means
for holding a tool connected to said piston rod, means to cause
an explosion of gases against first one and then another of said
pistons to reciprocate the same, said cylinders being connected
to said casing, said casing being slidably mounted in a frame,
and means to slide said casing along said frame.

"15. A plurality of cylinders, each of said cylinders con-
taining a piston, said pistons being connected, means for con-
necting a drill or other tool to said pistons, means for causing
an explosion of gases against first one of said pistons and then
against another of said pistons to reciprocate the same, a casing,
said cylinders being mounted in said casing, a frame, said cas-
ing being slidably mounted in said frame, and means to move
said casing along said frame.

"16. A plurality of cylinders, each of said cylinders contain-
ing a piston, said pistons being connected, means for connect-
ing a drill or other tool to said pistons, means for causing an
explosion of gases against first one of said pistons and then
against another of said pistons, means for cushioning said
pistons throughout the length of their stroke, a casing, said
cylinders being mounted in said casing, a frame, said casing

being slidably mounted in said frame, and means to move said casing along said frame.

"17. Two pistons connected by a piston rod and arranged in their respective cylinders, means for connecting a drill or tool to said piston rod, means to cause an electric spark and explode a gas alternately against each piston at the end of each stroke, a casing, said cylinders being mounted in said casing, a frame, said casing being slidably mounted in said frame, and means to move said casing along said frame.

"18. A plurality of oppositely arranged cylinders, a piston in each cylinder, said pistons being connected, a charge receiving chamber in each cylinder, each piston sliding in one of said charge receiving chambers, an explosion chamber opposite each charge receiving chamber, but separated therefrom by a piston, means for causing an electric spark alternately in each explosion chamber to explode a gas therein to propel the adjacent piston, a casing, said cylinders being mounted in said casing, a frame, said casing being slidably mounted in said frame, and means to move said casing along said frame.

"19. A rear compression internal combustion motor having a double acting unignited charge compressing free piston, and a free power transmitting element connected therewith.

"20. A motor having a self-balanced piston situated between chambers for confined compressed explosive charges of gas or vapor, and power transmitting means connected with such piston.

"21. Explosion chambers, means for supplying unignited explosive charges of gas or vapor to and firing the same in said chambers, free piston heads in said chambers positively connected for mutual reciprocation, an axially moving free power transmitting element connected with said piston heads and a guide for said element.

"22. Explosion chambers, means for supplying unignited explosive charges of gas or vapor to and firing the same in said chambers, free piston heads to said chambers rigidily connected for mutual reciprocation, a free power transmitting element connecting with said piston heads, and a guide for said element."

The interfering applications bear the following filing dates: Otho C. Duryea and Morris C. White, March 27, 1902; John V. Rice, April 16, 1903. It appears, however, that Rice had filed his original application for the invention on June 8, 1895, of which this is a division; and this having been regarded as a continuation of the former, he was considered the senior party. For the reason that the preliminary statement of Duryea and White had failed to overcome the prima facie case of Rice made by the filing of said two applications, the Primary Examiner cited them to show cause on or before October 10, 1904, why a decision against them should not be rendered on the record. They did not amend their statement, and in reply to the rule to show cause filed a motion to dissolve the interference on the following grounds: 1. That no interference in fact exists: 2. That there has been irregularity in declaring the interference: 3. That Rice has no right to make the claims in issue: 4. That the structure disclosed by Rice is inoperative. It was also moved that Rice be declared the junior party and the burden of proof shifted to him.

This motion was referred [by the Examiner of Interferences] to the Primary Examiner, who overruled it on all points in an elaborate decision. An appeal therefrom was taken to the Examiners-in-Chief, who dismissed the same on the ground that they had no jurisdiction thereof. This action of the Examiners-in-Chief was in turn affirmed on appeal to the Commissioner.

They then renewed their motion to shift the burden of proof, before the Examiner of Interferences, who denied the same, and on the same day, July 8, 1905, awarded priority to Rice, no attempt having been made by Duryea and White to amend their preliminary statement. Appeal from this decision was taken to the Examiners-in-Chief, who affirmed it, holding that Rice was entitled to the filing date of his original application, and was therefore the senior party. Under authority conferred by rule 126 they examined a number of affidavits presented by Duryea and White, and one by Rice, relating to the operativeness of Rice's device; and, coming to the conclusion that it was not operative, they called the attention of the Commissioner to

the fact, as provided in said rule. Pending appeal to the Commissioner from their decision affirming the award of priority to Rice, the latter referred the question of operativeness back to the Primary Examiner for re-examination and decision. The latter, with a number of expert affidavits before him, reviewed the alleged grounds of inoperativeness at length, and again decided that the device was an operative one. Duryea and White then petitioned the Commissioner to refer the case to the Examiners-in-Chief for rehearing, and were denied. The Commissioner then affirmed the decision of the Examiners-in-Chief awarding priority to Rice. From that decision this appeal was taken.

*Mr. Frederick S. Lyon* and *Mr. Francis M. Phelps* for the appellants.

*Mr. Fred E. Tasker* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

But two questions for determination are presented by the elaborate statement of the reasons of appeal: 1. Is the device described in Rice's application an operative one? 2. Is Rice the senior party in interference; or, in other words, is he entitled to date back to the filing of his original application on June 8, 1895?

The question of the operativeness of the device described in the application of the senior party to an interference has been presented to this court twice in different appeals in the same case. *Dodge* v. *Fowler,* 11 App. D. C. 592; *Fowler* v. *Dodge,* 14 App. D. C. 477. In the first of those appeals the Commissioner awarded priority to Fowler, and that decision was reversed on the ground that Fowler, though the first to conceive the invention, had failed to exercise due diligence in the matter of reduction to practice prior to the time that Dodge entered the office. Dodge was given the benefit of the application as a

constructive reduction to practice, but, as the Commissioner had incidentally expressed the opinion that Dodge's disclosed de- vice was inoperative, the opinion of the court concluded with these words: "We do not desire it to be understood by our de- cision that Dodge is entitled to a patent for his alleged inven- tion. What we decide is simply that, assuming that Fowler and Dodge have made the same invention independently of each other, and that Dodge has been the first to reduce it to con- structive practice by his first application for a patent, we think the question of due diligence should be settled in his favor as against Fowler. From the statements of the Commissioner and the Board of Examiners, the inference to be drawn would seem to be that Dodge's device is found to be wanting in patent- ability, and therefore that the declaration of interference was based upon mistake or inadvertence. It is true that no motion was made on behalf of Fowler to dissolve the interference; but if, under the law and the rules of the Patent Office, it is not improper, after adjudication of priority of invention, to re- fuse a patent to the successful party in the interference proceed- ings upon grounds that have first been developed in those proceedings, or upon grounds manifested at any time after the declaration of interference, we are not to be understood by this decision as precluding such action by the Office."

Upon the return of the case to the Patent Office a motion was made by Fowler to dissolve the interference on the ground that Dodge's device was inoperative. The Commissioner re- ferred the question to the determination of the expert Primary Examiner in the department to which the art belonged, who de- cided that the device was operative. This decision was treated by the Commissioner as finally settling the question of operative- ness in Dodge's favor, and in obedience to the determination of the court on the first appeal, he awarded priority to Dodge. On Fowler's appeal therefrom the question of operativeness was again raised. In its consideration we then said: "Under the special circumstances of this case we will assume that the appeal fully brings before us for determination  *  *  *  the whole question of the operativeness of the Dodge device and its

patentability." Patentability, it is obvious, had reference solely to the matter of operativeness. The decision was then affirmed.

Whether a device is operative is a question that necessarily presents itself in every application for a patent referred, in due course of proceeding under the rules of the Office, to the expert examiner of the class to which the alleged invention belongs. For that reason he is required to be skilled in the particular art. The decision of this examiner in respect of operativeness and other questions affecting patentability, if favorable to the applicant, is subject to the supervising power of the Commissioner only. It is only where the application is rejected for any reason, that an appeal regularly lies to this court in the last resort.

When an application has been allowed as patentable, and an interference declared, each party may raise the question of the operativeness of his opponent's device by a motion to dissolve the interference, as was done in this case. The question goes again to the Primary Examiner for his reconsideration, but no appeal from his decision, at the time it was rendered in this case, lay to the Examiners-in-Chief. The Commissioner alone could review it. The Examiners-in-Chief have the power, under rule 126, to report to the Commissioner, in the course of their decision in an interference case, that the device of either party is, in their opinion, inoperative, or unpatentable for any other reason. The Commissioner may then, and his general practice has been to, refer the question back to the Primary Examiner for further inquiry and determination. As the statement of the case shows, that practice was followed in this proceeding.

In adopting the conclusion of the Primary Examiner in respect of the operativeness of Dodge's device in *Fowler* v. *Dodge,* supra, the question was merely assumed as being before the court by reason of the peculiar conditions of the case.

As the question of the operativeness of one of the devices of the application now in interference is directly presented to us as an incident of the main question, of priority, we hold that it is not one for our consideration. It is, as we have before in-

·dicated, a preliminary question determinable, in the first in-
·stance, in the case of every application for a patent, and,
when determined in favor of the applicant, is not appealable.
When determined in his favor, and an interference is declared
·thereon with another similarly allowed application, the same
rule applies.    Priority of invention is the issue to be deter-
mined in an interference proceeding, the final decision of which
is appealable to this court.    The question of operativeness, hav-
ing been settled in accordance with the practice of the Patent
Office, cannot again be raised as incidental to the issue of prior-
ity, and brought up therewith for review.

This brings us to the consideration of the remaining question:
Is Rice entitled to date back to June 8, 1895, when his original
·application was filed, and thereby become the senior party to
the interference?    If so entitled, the decision in his favor must
be affirmed on the record.

Duryea and White filed no preliminary statement, and are
·therefore confined by the record to the filing of their applica-
tion, on March 27, 1902.    It is stated by the Primary Ex-
aminer in his decision upon the motion of Duryea and White
·to dissolve the interference and shift the burden of proof, that
Rice's original application contained claims to both an igniter
and an engine, and that "the disclosure therein is identical, so
far as the issue is concerned, with that of the pending case."
Neither of these statements has been controverted.    We adopt
the following extract from his decision as stating correctly the
proceedings had in regard to that application, and the con-
·clusions deducible therefrom:

"Rice's original application was filed June 8, 1895, No. 552,-
163, and contained claims both to the engine and to the igniter,
a fact at that time not regarded as necessitating division.    The
engine claims were rejected, erroneously, it must be held in view
of the subsequent decision by the Examiners-in-Chief on the
appeal taken by Duryea and White, allowing certain claims now
in issue.    After prosecution in the usual course, Rice's applica-
tion was passed for issue June 18, 1897, was allowed to forfeit,
and was renewed July 16, 1898, with additional claims to the

engine, which, as is not denied, it was entirely within the applicant's legal right to present. These additional claims were overlooked by the Office, and the case passed for issue, July 22, 1898, but almost at once, July 27, 1898, withdrawn, and the engine claims were then rejected on references after several actions. On December 30, 1898, the engine claims were rejected, and for the first time division was required between them and claims to the igniter. In responding to this action on March 28, 1899, Rice canceled the engine claims, not, it is to be observed, as anticipated, but in response to the requirement of division; and upon the case so limited, the Office took action April 25, 1899. It was by acceptance of this action only that Rice completed his election of the igniter, and not, as stated by Duryea & White, by his cancelation on March 28, 1899. *Ex parte* Preston C. D. 1880, p. 125; Johnston C. D. 1887, p. 64; Zabel C. D. 1888, p. 35; Maxim, C. D. 1888, p. 27. At any time up to April 25, 1899, Rice could have reinstated his claims to the engine as a matter of course, and for prosecution by appeal if necessary; after that date he could not do so, unless, perhaps, by clear showing of mistake in the cancelation, or by such acquiescence of the Office as actually occurred. He did, in fact, again present claims to the engine in his amendment of September 28, 1899, responding to the Office action of April 25, 1899. In the Office action (of November 2, 1899) upon the amendment of September 28, 1899, Rice was erroneously informed that he might elect whichever invention he chose, and it was not until October 25, 1900, in the Office letter replying to his amendment of October 12, 1900, that he was informed to the contrary. Upon being so informed, he promptly complied wih the Examiner's ruling, *viz.,* October 31, 1900, by canceling the engine claims. It is to be observed that this action by Rice was less than two years from the date of the Office action of April 25, 1899; so that, even if he be held to have been concluded by his election in accepting the action of that date, he nevertheless took such proper action as the case required within two years from the date of the last Office action thereon. In other words, he prosecuted his case in good faith by doing all that the

law and the rules required up to October 30, 1900, and, in view
of the Office actions, it was on that date only that he was final-
ly concluded by his election from reinserting claims to the
engine.    Duryea and White are therefore wholly in error,
as well as obscure, in their statement that 'since December 30,
1898, John V. Rice has had no right to include in his original
or renewed application any claim to the engine structure,'
since on December 30, 1898, the original application was no
longer in being, having been superseded by the renewal, and
as to the latter no final election took effect until October 30,
1900.

"Although Rice's action of October 30, 1900, canceled the
claims to the igniter, certain formal defects remained uncured,
and, being noted in the Office letters of October 31, 1902, and
May 13, 1903, were disposed of by amendments April 30, and
May 18, 1903, putting the case in condition for allowance, and
it matured into the patent No. 749,324, above referred to."

There is nothing in the foregoing recital tending to show an
abandonment of the claim of invention of the engine of the is-
sue, disclosed in Rice's original application.

When the claims therefor were rejected, for the reasons
given, he had his election to insist thereon and appeal from a
second rejection, or to accept the action of the Patent Office,
take his patent for the igniter, and then file another application
for a patent for the invention of the engine.    Electing to pur-
sue the latter course, he filed the new application, which is sub-
stantially a division of the former application, on which the in-
terference was declared with Duryea and White, and while that
original application was still depending in the Office awaiting
final action.    There is no express limitation in respect of the
time within which a divisional application shall be filed, in or-
der to relate to, and constitute a continuation of, the original ap-
plication.    The rule that seems to prevail in the Patent Office is
that, to maintain this continuity, it must be filed while the orig-
inal is depending in the Office.    When filed within that time, it
has been repeatedly held by different Commissioners of Pat-
ents, that the second application stands in lieu of the first to

the extent of the matter subtracted from the other. *Forbes* v. *Thompson,* 51 Off. Gaz. 297, and cases cited, C. D. 1890, pp. 61, 63; 53 Off. Gaz. 2042, C. D. 1890, pp. 185, 186; *Bundy* v. *Rumbarger,* 92 Off. Gaz. 2002, C. D. 1900, pp. 143, 145; *Hopfelt* v. *Read,* 106 Off. Gaz. 767, C. D. 1903, pp. 319, 321. In the decision last cited, Mr. Commissioner Allen, after stating the rule that a complete application warranting the issue of a patent, and unabandoned, is in law a constructive reduction to practice, said: "This is so when two applications are pending contemporaneously and the first is not abandoned, whether the claims are presented in the original application itself, or in a later application filed as a division or a continuation of the original application, as in the second case the later application dates back to the earlier one. It is only necessary that the description in both applications shall be sufficient to support the claims. The fact that the Office practice may prohibit the prosecution and allowance of the claims in an earlier application does not prevent the applicant from availing himself of the earlier date of filing as his date of constructive reduction to practice, when he files a later application containing the same description and the claims based upon the same."

This court has heretofore held that where an application had been forfeited for failure to pay the fee on allowance of the claims, and the applicant had filed a new application within the prescribed period permitted in such cases, he was entitled to the benefit of his original application as a constructive reduction to practice of the invention set forth therein and afterwards embodied in the second application. *Cain* v. *Park,* 14 App. D. C. 42, 46.

For a stronger reason, we think that a divisional application filed while the original application is depending in the Office must be held a continuation of the latter, and therefore to relate back to its filing date.

The situation is not governed by sec. 4894, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 3384, as contended on behalf of the appellants. That section requires that all applications for patents shall be completed within two years after filing, "and in

default thereof, or upon failure of the applicant to prosecute the same within two years after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Commissioner of Patents that such delay was unavoidable."

The section has been held to apply to a case where more than two years had been permitted to elapse between the final rejection of the application and the date of filing a bill in equity to compel issue under sec. 4915, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 3392; *Gandy* v. *Marble,* 122 U. S. 432, 440, 30 L. ed. 1223, 1224, 7 Sup. Ct. Rep. 1290.

Let it be granted that the section applies, likewise, in a case where the divisional application shall have been filed after the lapse of two years from the time of final action in the Office upon the original; still, the facts of this case do not warrant its application.  Two years did not elapse after such final action on the original application before the divisional application was filed.   Until all the objections to the final application had been met and overcome, and the same had been finally allowed for patent, Rice was not put finally upon his election to accept the action necessitating the division of his application. When the time arrived for him to take final action, he filed the divisional application with the required diligence, and thereby preserved the continuity of the first for his protection as the inventor of the engine of the issue.

We are of the opinion that the decision appealed from was right, and it will be affirmed.   It is so ordered, and the clerk will certify this decision to the Commissioner of Patents as the statute provides.                                   *Affirmed.*